## F. W. POE MFG. CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 4735.

Circuit Court of Appeals, Fourth Circuit.
April 7, 1941.

James H. Price, of Greenville, S. C. (James D. Poag and James H. Price, Jr., both of Greenville, S. C., on the brief) for petitioner.

Mortimer Kollender, Asst. Gen. Counsel, National Labor Relations Board, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, Owsley Vose, and Frank Donner, National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

F. W. Poe Manufacturing Company, a South Carolina corporation, petitions the court to review and set aside an order of reinstatement issued by the National Labor Relations Board, and based on the finding that, in violation of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., the corporation had wrongfully refused to reinstate one Coley L. Smith to his former position in its employ.

Originally, the complaint was formulated by the Board upon charges filed by the Textile Workers Union of America, and alleged, amongst other unfair labor practices, that the corporation, in violation of §.8(1) and (3) of the Act, had discharged

Smith on June 12, 1939, because of his membership in and activities on behalf of the Union. After a hearing, the trial examiner recommended a dismissal of the complaint in its entirety. Thereupon, the Union filed amended charges and the Board amended its complaint by adding the allegation that, in violation of § 8(1), (3) and (4) of the Act, the corporation, on and after October 1, 1939, refused to reinstate Smith as an employee because he had filed charges against it.

When the case came before the Board, the following findings were made with reference to the charges originally filed: "We find that the allegations of the complaint that the respondent has advised its employees to withdraw from or refuse to join the Union; threatened them with layoff, discharge, or disciplinary action if they were active in its behalf; promised them better jobs if they withdrew therefrom; informed Union members that it disliked their attitude because of their activities; and advised employees that the Union would not benefit them, are not sustained by the evidence. We will, accordingly, order that such allegations be dismissed."

The Board also concurred in the findings of the trial examiner that Smith was not discharged in violation of the Act in the following words:

"To summarize, we concur in the Trial Examiner's findings that Smith was not discharged because of his Union membership and activity but was laid off along with 7 other weavers and 8 loom fixers, none of whom were shown to be members of the Union, when installation of the new machinery enabled the respondent to effect a saving by thus reducing its force of employees; that when Smith and the other 15 employees were laid off they were told to report to the spare floor but that Smith did not do so and for this reason did not receive reemployment.

"Upon the entire record we find that the evidence fails to sustain the allegations of the complaint that the respondent discriminated against Smith because of his Union membership and activity by discharging him on June 12, 1939, and thereafter refusing to reemploy him. We will accordingly order that such allegations be dismissed."

The events in June, 1939, referred to in the Board's summary, are shown by the undisputed testimony of Smith or other witnesses. Smith had worked for the corporation for six or seven years, and understood that when an employee was not discharged, but laid off and told to report to the spare floor, it was his duty to report every day in order to see if there was available work. Instead of complying with this practice, Smith, being angry because he was deprived of his regular position, failed to report to the spare floor and a few days later, made complaint to the Union that he had been discharged. On June 13, a position of weaver became vacant, and Smith would have been given the place had he been on the spare floor. In his absence, another was chosen. On June 22, acting under the instructions of the Union, he returned to the mill and asked for employment, but was told that there was none.

It is now conceded that the conduct of the employer up to this time was without fault, but it is said that the subsequent circumstances and the testimony of the employer's executives demonstrate that thereafter the corporation wrongfully refused to reinstate Smith for the reason that he had filed charges against it under the act. The subsequent circumstances are thus summarized in the findings of the Board:

"The complaint as amended alleges that Smith was refused employment on or about October 1, 1939, and thereafter, for the additional reason that he filed or caused to be filed charges under the Act.

"On September 12, 1939, the Union filed its charges herein. In the latter part of September or early in October 1939, a representative of the Board called at the plant and informed Stall, the respondent's president, that the Union had filed charges with respect to Smith's dismissal on June 12, 1939. This was the first notice given the respondent that it was being charged with having discharged Smith because of his Union membership and activity. On this occasion Stall was asked by the Board's representative if he would give Smith employment and refused to do so, assigning as his reason therefor that there were no jobs available at that time. On or about October 15, 1939, Smith went to the door of the plant, asked for Burnett, and when he appeared, requested employment. Burnett advised Smith that there was no employment for him. Subsequent to Smith's application for employment two weavers, who had not previously been in the respondent's employ, were given employment by the respondent. (The record is

not altogether clear as to the dates of the employment of the two weavers but apparently one was hired in November and one in December). Burnett testified that at the time the two new weavers were employed weavers were needed, that there were none available on the spare floor who could do the work, and that the two men came in 'wanting to work' and were employed. Burnett testified that he made no effort to locate Smith when these vacancies occurred because he did not know where to find him and also because he thought that Smith was working elsewhere."

The company's executive and supervisory employees testified that there was no vacancy on June 22 or October 15, 1939, when Smith asked for employment, or on the occasion in September or October when the Board's representative called at the mill and inquired if the company would give Smith employment. There was no evidence to the contrary. It was also proved without contradiction that it was not the practice of the mill to keep a written list of employees ordered to report to the spare floor, or to send for one of them when a vacancy occurred; but in such event, the overseer went to the spare floor and selected an employee from those present. Similarly, there was no evidence in conflict with the employer's testimony that there were no suitable weavers on the spare floor on the two subsequent occasions when outside weavers were taken on, and hence the positions were given to men, who came in and asked for work. One of these selections was made in November, 1939, and the other on or about January 1, 1940. At these times, according to the uncontradicted testimony, Smith's whereabouts were unknown to the company officials. He was in fact working at the Isaqueena Mill at Central, South Carolina, for about five weeks before Christmas, 1939, and at the Mills Mill in Greenville, South Carolina, from about January 1, 1940 up to and including the day of the hearing before the trial examiner in the middle of February, 1940.

Obviously, no inference of hostile discrimination against Smith can be drawn from these circumstances. On the contrary, discrimination in his favor, such as the employer was under no duty to grant, would have occurred if the employer had performed the acts whose omission the Board accepted as evidence of illegality. If Smith had been reinstated in June or October, of necessity some other worker would have been displaced to make room for him; and if his whereabouts had been known to his employer in November and December, and he had been sent for and given a place in preference to the new men present and asking for work, a favor would have been extended that it was not the practice of the company to grant to absent employees. It should be kept in mind that the so-called spare list was not a written memorandum kept in the course of business, but a group or body of extra hands that were willing to report daily to the mill to fill casual vacancies; and that Smith, refusing to accept this limited opportunity, chose to consider himself discharged, complained to the Union, and sought other employment. Whatever were the privileges of persons on the spare list, Smith had no claim to them.

Upon what then does the adverse holding of the Board rest? It is succinctly stated in the following paragraph from the Board's decision:

"When the two new weavers were employed, there were no weavers available on the spare floor and in such circumstances it was the respondent's practice to recall weavers on the spare list. In view of the testimony of both Stall and Rodgers that the respondent had determined in October not to reemploy Smith because of the charges filed herein we do not credit Burnett's testimony that Smith was not offered employment on those occasions because his whereabouts was unknown or because it was thought that he was employed elsewhere. (While Smith was employed at a textile mill in Greenville at the time of the hearing it appears that this employment began about the first of January 1940)."[1] "By reason of the application made on behalf of Smith by the Board's representative in early October and Smith's personal application on October 15 the respondent knew that Smith was available and desired reinstatement. Moreover, Burnett conceded that Smith was a 'very fair weaver' and it is reasonable to assume that when the spare floor was exhausted this factor would have entitled him to consideration over weavers who had not previously been in the respondent's employ. Under these

---

[1] As shown above, Smith was also employed in a mill at Central, South Carolina, for five weeks before Christmas, 1939.

circumstances we are satisfied and find that Smith was a laid-off employee and that the actual reason Smith was not recalled to work was the one stated by both Stall and Rodgers, namely, because he had filed allegedly 'false' charges against the respondent; we likewise find that, except for the filing of such charges, Smith would have been employed by the respondent on or before December 1, 1939."

There was, however, no substantial evidence to support the premise of fact stated by the Board that it was the company's practice when it needed weavers and none were found on the spare floor, to pass over new applicants on hand and send for old employees on the spare list. Isolated statements in the testimony of the company's executives in an examination covering several hundred pages indicate that if the spare floor was bare of employees at the time of an emergency, absent employees would be sent for; but no one testified that this would be done if new hands were immediately available. The contrary policy of the company to require the presence of its workers was so clearly and forcibly stated in the testimony as to be unmistakable.

Nor, was there any testimony to show that Stall, the president, or Rodgers, the superintendent, knew the whereabouts of Smith in November and December, 1939, and January, 1940, during which period he was in fact working most of the time in other mills. This lack of proof was not supplied by the Board's inability to credit the testimony of the employer's witnesses in this respect; the existence of knowledge on the part of an accused who denies his guilt cannot be shown by merely refusing to believe him. And, even if Smith's whereabouts were known, there was no obligation to send for him.

The conclusion of the Board really rests upon testimony of Stall, the president of the company, and Rodgers, the superintendent of the plant, that indicated an unwillingness on their part to reinstate Smith because he had filed charges against the company. When the representative of the Board called in September or October and asked whether the company would take Smith back, the representatives of the company replied that there was no vacancy and they refused to say whether they would or would not take him back in case a vacancy should occur. They were unwilling to take him back during the pendency of the charges, of which they were then for the first time informed. Stall testified that he did not think that an employee who had filed false charges would make a loyal and truthful employee, and that if Smith had appeared on the spare floor when a weaver was needed, he would not have received employment. Rodgers testified that while he would have put Smith back to work if he had not made the charges against the company and had reported to the spare floor, he did not feel, after the charges were filed, that Smith would make a faithful or efficient employee, and hence it would not be to the best interest of the company to reinstate him.

Undoubtedly this evidence warrants the conjecture that if Smith had been available when vacancies occurred, he would probably have not been chosen, although of course one cannot be quite certain what decision the company would have made if confronted with the actual situation. It is sufficient to say that the employer was never called upon to make this particular choice, and that no unlawful discrimination actually occurred. The National Labor Relations Act is not concerned with hypothesis, but with realities; it does not seek to prohibit evil intent but unfair labor practices, and there was no substantial evidence of such a practice in this case.

A decree will be entered setting aside the order of the Board.